# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

**************************************************

| | | |
|---|---|---|
| In re: | * | **Chapter 11** |
| | * | **Case No.  Case No. 01-11565** |
| **BANGOR & AROOSTOOK RAILROAD** | * | |
| | * | |
| Debtor | * | **(Jointly Administered)** |

**************************************************

| | | |
|---|---|---|
| **JAMES E. HOWARD, CHAPTER 11 TRUSTEE** | * | |
| **OF BANGOR & AROOSTOOK RAILROAD** | * | **Adversary Proceeding** |
| **COMPANY,** | * | **Case No. 03-1205** |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| **BURLINGTON NORTHERN & SANTA FE** | * | |
| **RAILWAY COMPANY,** | * | |
| | * | |
| Defendant | * | |

**************************************************

| | | |
|---|---|---|
| **JAMES E. HOWARD CHAPTER 11 TRUSTEE** | * | |
| **OF BANGOR & AROOSTOOK RAILROAD** | * | **Adversary Proceeding** |
| **COMPANY,** | * | **Case No. 03-1206** |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| **CSX TRANSPORTATION, INC.,** | * | |
| | * | |
| Defendant | * | |

**************************************************

| | | |
|---|---|---|
| **JAMES E. HOWARD CHAPTER 11 TRUSTEE** | * | |
| **OF BANGOR & AROOSTOOK RAILROAD** | * | **Adversary Proceeding** |
| **COMPANY,** | * | **Case No. 03-1211** |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| **CANADIAN PACIFIC RAILWAY LIMITED** | * | |

```
                                                    *
Defendant                                           *
*******************************************
```

## MEMORANDUM OF DECISION

In these consolidated adversary proceedings, the trustee of Bangor and Aroostook

Railroad Company ("BAR")[1] asserts that the defendants, other railroads who were entitled to

payment from BAR for interline freight charges at all pertinent times, "improved their position"

vis a vis BAR during the ninety days before bankruptcy (<u>i.e.</u>, they were owed less on the petition

date than they were on the ninetieth day preceding the petition).  He asserts that defendants were

paid their freight charges via monthly "setoffs" and that, under § 553(b),[2] those setoffs are

avoidable to the extent they reduced what BAR owed each over the ninety day period.  The

defendants have moved for summary judgment, arguing that § 553(b) does not apply.  They

contend that no avoidable setoffs occurred because the funds that flowed to them were their own

funds all along - that BAR merely collected their freight charges and held them as their trustee.

Alternatively, they assert that the monthly "netting out" process was recoupment, immune from

the Code's applicable avoidance provision.

Because I do not agree with the defendants that a federal common law rule imbues

interline freight receipts with trust fund status, and because recoupment is inapplicable to the

---

[1]       The following affiliated entities are also debtors: Canadian American Railroad
Company, Case No. 02-10858; Logistics Management Systems, Inc., Case No. 02-10864; Newport
and Richford Railroad Company, Case No. 02-10856; The Northern Vermont Railroad Company
Incorporated, Case No. 02-10857; and Van Buren Bridge Company, Case No. 02-10865.

[2]       Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy
Reform Act of 1978, as amended ("Bankruptcy Code" or "Code"), 11 U.S.C. § 101 <u>et seq</u>.

2

circumstances here, their motion for summary judgment will be denied.

## Procedural Background

BAR was haled into bankruptcy involuntarily by a petition filed August 15, 2001.  An

order for relief entered against it on December 4, 2001.  James Howard, BAR's trustee, initiated

these three adversary proceedings, asserting the estate's right to recover from each defendant the

amount that BAR's obligation to it declined during the ninety-day pre-petition period.  Each of

Howard's complaints invoked § 553(b) and characterized the railroads' inter-line settlement

processes as effecting set-offs.  The adversary proceedings have been consolidated, and the

defendants have moved for summary judgment on the ground that § 553(b) is inapplicable.

Howard has cross-moved for partial summary judgment, seeking a determination that § 553(b)

applies.[3]

## Factual Background[4]

Shipping freight any distance by rail generally requires the services of several railroad

lines.  Shipments come and go throughout the country, originating and traveling on multiple

railroads.  Shippers routinely pay one carrier (the "collecting carrier")  a charge for the entire

---

[3]      The cross-motion is really nothing more than a legal contention.  The defendants say
they prevail if § 553(b) does not apply.  As no other legal point is at issue here, their failure to
prevail could only result from a determination the statute applies.

        The defendants have also argued that, even under a § 553(b) analysis, Howard cannot
establish the extent to which their position improved.  In response, Howard has interposed Fed. R.
Bankr. P. 56(f), asking for additional time to gather proof on the exact state of accounts between the
parties.  The defendants have agreed to save that factual argument for another day.  Even without
such agreement, I would, if pressed, grant the trustee's Rule 56(f) request.

[4]      The pertinent facts are stipulated.  Howard filed a statement of "additional" facts, but
did so when it appeared that the issue of proof described in the preceding footnote was in contest.
Those additional facts are irrelevant to the legal issue now before me.

journey.  That amount includes the charges of each railroad along the way.  Thus, with regard to

inter-line shipments, each railroad may be at once the collecting carrier for some, receiving funds

and accruing obligations to participating carriers; and for others a participating carrier, accruing

rights to freight charges for shipments which travel over its rails.  In order to sort out who owes

what to whom, many railroads, including those before me, have entered into a comprehensive

arrangement to "net out" their entitlements and obligations on a monthly basis.[5]

Under pertinent agreements, BAR and the defendants are beneficiaries of the Railroad

Clearinghouse, Inc. (the "Clearinghouse" or "RCH"), a trust established by the Association of

_____

[5]       Although the settlement mechanism differs in detail today, the general arrangement
was described in In re Penn Central Transp. Co., 486 F.2d 519, 521 (3d Cir. 1973) (quoting district
court opinion and order):

> The nation's railroads function in many ways as a single system.  For
> example, a shipper or receiver pays one railroad for services of
> carriage for the entire shipment, although the shipment may travel
> over many different railroads; a railroad car may travel over the lines
> of many different railroads, and be used by each of them, before it
> again returns to the possession of the owning railroad; and a shipper
> whose freight may have been damaged in shipment by one of several
> carriers may apply to any of them for payment of his claim.  The
> railroads have created a system of accounting and periodic settlement
> of accounts to facilitate this manner of operation.  The accounting for
> various types of rail service rendered to the public or to other
> railroads results in "interline accounts," and the striking of balances
> between the railroads with respect to these interline accounts results
> in "interline balances."  Each of the accounts is settled separately;
> there is no netting of the balances in different accounts.

The methods of accounting and payment for interline services, however, are not
controlled by statute but by industry accounting practices and rules.

At issue today are only interline freight charge accounts.

4

American Railroads ("AAR") to facilitate settlement and payment of interline freight charges

among its members.[6]   Railroads doing business under the Clearinghouse structure agree to deal

with one another through rules promulgated by AAR.  Those rules include the Railway

Accounting Rules and the ISS (Interline Settlement System) Railroad Clearinghouse Settlement

Regulations, collectively referred to as the Interline Settlement Rules.[7]  General Mandatory Rule

149 outlines the ISS's operation in detail:

**149 Funds Transfer of Interline Balances**

A.  **On an interline shipment, the carrier responsible for collecting freight
and/or switching charges, including absorbed switching charges, due from
the consignor, consignee, or other party ("the collecting carrier") acts for
and on behalf of the participating interline carriers in the collection and
forwarding of all funds due in connection with such charges** and further acts
as guarantor to the other participating interline carriers with respect to the
collection of all individual charges which comprise such funds.  Regardless of
whether the collecting carrier has effected the collection of the related individual
charges due from the consignor, consignee or other party, the collecting carrier

---

[6]      The AAR Railroad Clearinghouse Trust Agreement establishes AAR as trustee,
includes a formal trust declaration, and identifies the trust res as "[a]ll monies and other property,
held by the Trustee pursuant" to the trust agreement.  It identifies the purpose (and, generally the
operation) of the trust in the following language:

> The purpose of the Trust is to enable AAR to hold and invest funds on behalf
> railroads participating in the Railroad Clearinghouse.   AAR and the
> Beneficiaries intend that AAR will net each beneficiary's debits and credits
> through its Interline Settlement System; that each net debtor Beneficiary will
> transfer funds to pay its net debit balance to the Trustee; and that the Trustee
> will direct the depository institutions(s) to pay appropriate amounts to those
> Beneficiaries having net credit balances.

Trust Article III, ¶ A.  The relationship of the parties to the Clearinghouse, which reports railroads'
net positions and receives and distributes funds pursuant to the settlement scheme, is not at issue
here.  Rather, the relationship of the railroads to one another is germane.

[7]      The Interline Settlement Rules are attached to the parties' stipulation as Exhibits A1
(Accounting Rules) and A2 (Settlement Rules).

must remit to the participating carriers their proportion of all funds due under the applicable divisional agreements, price authorities, or other authorities.

B.  The ISS will furnish details of all Interline Freight Settlements including the amounts due and payable by the collecting carrier to each interne carrier and the Railroad Clearing House on the first calendar day of the month following settlement.  Any discrepancy in this statement must be called to the attention of the ISS.  The Railroad Clearing House will administer the exchange of funds on the second working day.

**C.  In discharging its obligations to other participating interline carriers, the collecting carrier acts as a trustee, and holds monies collected in trust for the other carriers in the route, under applicable law concerning interline freight accounts.  Carrier obligations under this Freight Mandatory Rule 149 shall be governed by the law concerning the settlement of interline freight revenues as enunciated in the United States Court of Appeals for the Third Circuit in In re Penn Central Railroad, 486 F.2d 519 (3rd Cir. 1973).**

D.  The paying carrier must pay each switching carrier, including any intermediate switching carriers, its proportion of the switching revenue. Settlement will be made on net balances which will be immediately subject to sight draft payment by check/voucher or other agreed means of exchanging funds.

Stipulation A1 at p. 22 (emphasis added).

Although participating railroads are expected, indeed required, to dispatch funds to the

Clearinghouse as dictated by its monthly Net/Net Position Report, the Interline Settlement Rules

authorize carriers to exercise setoff rights against one another directly when they are unable to

resolve disputes by less confrontational means.[8]

---

[8]      Settlement Regulation 3.5 provides:

MEMBERS RIGHT OF OFFSET - AAR GENERAL MANDATORY RULE 1

A member shall have the right to invoke AAR General Mandatory "Rule 1" and so notify the affected member and the RCH Administrator of the amount of offset, in writing an detailing respective services, amounts, and dates, by 3:00 Eastern Time, two days prior to the funds transfer date, that the amounts owed that member are stricken from the settlement.

6

**Discussion**

**1.  Setoff and § 553**

The trustee contends that by way of the interline settlement system, each of the

defendants, through setoff,  reduced the amounts owed to it by BAR during the ninety days

before the petition was filed.  He invokes § 553(b) in an attempt to recapture for the estate the

amounts by which each defendant improved its position during the critical period.  Section

553(b) provides as follows:

> (b) (1) Except with respect to a setoff of a kind described in section 362(b)(6),
> 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, **if a creditor
> offsets a mutual debt owing to the debtor against a claim against the debtor
> on or within 90 days before the date of the filing of the petition, then the
> trustee may recover from such creditor the amount so offset to the extent
> that any insufficiency on the date of such setoff is less than the insufficiency
> on the later of –**
>
> > **(A) 90 days before the date of the filing of the petition;** and
> > (B) the first date during the 90 days immediately preceding the date of the

Stipulation Exhibit A2 at 5.

AAR General Mandatory Rule 1 states, in pertinent part:

> Right to Offset
>
> Carriers should use all diligence to resolve disputes on unpaid amounts before
> resorting to the use of Rule 1.  If all attempts fail, carriers have the right to offset any
> monies owed to them by carriers refusing to pay any interline freight, switching,
> overcharge claims, car service billing and car hire, car repair bills and freight loss
> and damage claims upon presentation of draft or bill for undisputed items if the items
> are presented in accordance with existing rules and procedures as provided for in the
> Association of American Railroads' Railway Accounting Rules.  Said right to offset
> shall continue in effect until such unpaid amount has been satisfied.
>
> > *       *       *

Stipulation Exhibit A1 at 1.

7

filing of the petition on which there is an insufficiency.

**(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.**

11 U.S.C. § 553(b) (emphasis added).

A right of setoff is grounded on the existence of "mutual debts." A owes B "x" dollars; B owes A "y" dollars; setting off, A may pay B "x-y." Setoff is rooted in nonbankrputcy law. "Only when a creditor enjoys an independent right of setoff will the consequent exercise of a setoff right against a debtor come within the further, Code-imposed requirements and limitations of § 553." 3 William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d, § 63:3 at 63-17-18 (1997) (footnotes omitted) (hereafter "Norton").

Section 553's mutuality requirement comprehends debts existing between the same parties, owing and held, in the same right and capacity. See generally Norton § 63:5; 5 Lawrence P. King, Collier on Bankruptcy ¶ 553.03[3] (15th ed. rev. 2004) (hereafter "Collier"). The Code, however, does not define "mutual."

The question is whether BAR and each of the defendants incurred "mutual debts" with regard to collected interline freight charges. The defendants' contentions regarding trust and recoupment characterize their relations with BAR as something other than the "mutual debt" circumstance to which § 553(b) applies.

Without Rule 149's gloss, the relations between BAR and each of the defendants is a classic case of mutual debts. Each interline freight shipment triggers charges attributable to the services provided by each of several railroads. The collecting railroad takes in the entire fare - and owes prescribed portions of it to each participating carrier. That there are multiple

shipments and multiple parties is of no moment.  The circumstances reduce to sets of bilateral

relationships in which one railroad owes freight charges to another, and the second owes freight

charges back to the first.  However difficult it may be to determine mutuality in other contexts,

there can be no doubt that here the debts, if debts they be, are mutual.[9]  But are they debts or

something else?

The defendants say that BAR collects and holds their funds with an obligation to pay

them over.  They assert that, pending each monthly settlement and remittance, BAR is their

trustee.  As trustee, BAR holds no beneficial interest in the money.  It merely releases their funds

by way of settlement.  There is no "debt."

### a.  Trust Funds and the Bankruptcy Estate

Although analyzing the trust argument in the § 553(b) context is unusual, bankruptcy

courts regularly confront the same issues when defining the content of a bankruptcy estate under

§ 541.[10]  Section 541(a)(1) defines the bankruptcy estate as "all legal or equitable interests of the

debtor in property as of the commencement of the case."  But § 541(d) makes clear that property

in which the debtor holds "only legal title and not an equitable interest" becomes "property of

the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of

---

[9]     In the simplest terms, the obligations are between the same parties; they are owed in
the same capacity (as carriers involved in an interline shipment); and they are owed in the same right
(the obligations are not of different character, i.e., joint vs. several).  See, e.g., Collier ¶ 553.03[3].

[10]     The instant problem is much like that addressed in Begier v. IRS, 496 U.S. 53 (1990).
There the Supreme Court considered whether a debtor's prepetition payments toward federal
withholding taxes could be recovered as preferences under § 547(b).  The government contended
that the payments did not involve transfers of the debtor's property because it held the funds it paid
"in trust" for the taxing authority.  To answer the question the Court turned to § 541(a) & (d), as we
do infra.

any equitable interest in such property that the debtor does not hold." Given the relative

attractiveness of asserting equitable title to what otherwise might become an estate asset, with

the concomitant ability to obtain the funds early and in full, parties regularly assert their

entitlement to funds held by a bankruptcy debtor, arguing the debtor holds bare legal title as their

trustee.[11]

When the issue is whether a party is a creditor, with a claim against the estate, or a

beneficiary, with rights to obtain funds "off the top," the applicable general principles are

settled:

> When property of the estate is alleged to be held in trust, the burden rests
> upon the claimant to establish the original trust relationship.  The claimant must
> prove title and identify the trust fund or property and, where the fund or property
> has been mingled with the general property of the debtor, the claimant must
> sufficiently trace the property. However, if it cannot first be shown that a trust has
> been created, there is no necessity for inquiry as to whether the property can be
> identified or traced.  **Additionally, where the recipient of the funds can by
> agreement use them as the recipient's own and commingle them with the
> recipient' own monies, a debtor-creditor relationship exists, not a trust.**

5 Collier ¶ 541.11, at 541-59 (footnotes deleted) (emphasis added).

The Settlement Rules do not require that the collecting carrier segregate the freight

charges attributable to the carriers participating in each interline shipment, nor do they limit the

collecting carrier's use of funds so received.  The Settlement Rules require only that all

---

[11]     The claimed trust relationship may be either express (under an agreement or trust instrument)  or implied (a constructive or resulting trust). See Fleet Nat'l Bank v. Valente (In re Valente), 360 F.3d 256 (1st Cir. 2004) (recognizing validity of resulting trust under Rhode Island law); Davis v. Cox, 356 F.3d 76, 90-92 (1st Cir. 2004) (articulating general principle and applying it to constructive trust).  Unlike instances in which a court considers imposition of an implied trust to *remedy* wrongdoing (something the First Circuit has demonstrated a willingness to do of late, see Davis, supra; In re Valente, supra), we are here confronted with an attempt to create a trust relationship consensually in the context of commercial enterprise.

10

participating railroads forward funds to the Clearinghouse to satisfy the Net/Net Position Report. Thus, if this were a mill run case, we could stop here. Such arrangements are insufficient to establish <u>bona fide</u> trust relationships so that the putative beneficiary will win out over the putative trustee's bankruptcy estate. <u>Id.</u>; <u>Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Service, Inc.)</u>, 113 F.3d 1091 (9th Cir. 1997); <u>First Fed. of Michigan v. Barrow</u>, 878 F.2d 912 (6th Cir. 1989) (recognizing general rule that if trust funds cannot be identified or sufficiently traced, party asserting trust relationship is left to creditor status). Consistent with this general proposition, in such circumstances courts virtually unanimously hold that the relationship is creditor/debtor, leaving the claimant with a right to distribution from the estate (as an unsecured creditor) in accordance with the Bankruptcy Code's priority scheme. <u>E.g.</u>, <u>Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt., Inc.)</u>, 4 F.3d 1329, 1335-36 (5th Cir. 1993) (broker commissions placed in debtor's general operating account and commingled with other funds; brokers determined to be general unsecured creditors); <u>Evans Fur Co. of Houston, Inc. v. Chase Manhattan Bank (In re Sakowitz, Inc.)</u>, 949 F.2d 178 (5th Cir. 1991).

In re Morales Travel Agency, 667 F.2d 1069 (1st Cir. 1981), is instructive. There the debtor, Morales Travel Agency ("Morales"), operated under the International Air Transport Association (IATA) Passenger Sales Agency Agreement and pertinent IATA Resolutions. The agency received blank airline tickets which were "to remain property of the airlines" until sold to passengers. Morales (and other travel agencies) guaranteed the price of the tickets to the airlines and agreed that money received from ticket sales "'shall be held by the Agent in trust for the Carrier or on behalf of the carrier, until satisfactorily accounted for to the Carrier and settlement

11

made.'" <u>In re Morales Travel Agency</u>, 667 F.2d at 1070.  Morales was not required to segregate

ticket sales proceeds and commingled the proceeds with its general operating funds. <u>Id</u>.[12]

　　　When Morales was adjudicated bankrupt (under the Bankruptcy Act), it owed Eastern

Airlines $379,482.20.  <u>Id</u>.  Eastern sought to compel Morales's trustee to turn over the money

due it, arguing that under the IATA Passenger Sales Agency Agreement the proceeds of its ticket

sales were held in trust for it by Morales, and, therefore, not part of the bankruptcy estate.  <u>Id</u>. at

1071.  The First Circuit held:

> The terms of the IATA Agreement and Resolutions were inadequate, in our
> view, to give rise to a trust upon the proceeds from tickets sold by Morales to its
> customers.  To be sure, Resolution 820(a) recited, in general terms, that the agent
> was to hold whatever monies it collected in trust for the carrier until accounted
> for, and that these monies were the carrier's property until settlement occurred.
> However, talismanic language could not throw a protective mantle over these
> receipts in the absence of a genuine trust mechanism.  Here the relationship
> remained in practical fact that of debtor-creditor.  The contract nowhere required
> Morales to keep the proceeds of Eastern's ticket sales separate from any other
> funds, whether Morales' own funds or the proceeds of other airline's ticket sales.
> Nor was any specific restriction placed upon Morales' use of the supposed trust
> funds.  Morales was left free to use what it received for its own benefit rather than
> Eastern's, and to transform the receipts into assets with no apparent encumbrance,
> upon which potential creditors might rely.  The use of the word "trust" and the
> designation of the airline as title-holder, in a contract which is not publicly filed,
> would not save potential creditors from relying on such assets as office
> equipment, accounts receivable, and a bank account solely in the name of the
> agency.  In the absence of any provision requiring Morales to hold the funds in
> trust by keeping them separate, and otherwise restricting their use, the label
> "trust" could in these circumstances and for present purposes have no legal effect.
> <u>See</u> <u>In re Penn. Central Transportation Co.</u>, 328 F. Supp. 1278 (E.D.Pa. 1971);
> Scott on Trusts § 12.2 (3d ed.).

---

[12]　　　The funds Morales collected were a mix of its own charges (travel agency fees) and
funds owed to others (<u>e.g.</u>, Eastern Airlines), just as the funds BAR collected for interline shipments
were a mix of its own charges and those of others.

Id. at 1071-72 (footnote omitted).[13]  The arrangement contained other terms that reinforced the

court's conclusion: the travel agency guaranteed payment even if it did not collect funds for

ticket sales and Morales was not required to remit funds upon receipt or demand, but, rather, at

specified intervals.  Id. at 1072.  Thus, for "everyday purposes" the relationship was debtor-

creditor and the trust label was "a draftsman's concept, designed to rescue Eastern in a situation

such as [the agency's bankruptcy] but otherwise to be ignored."  Id.

### b.  Interline Freight Charges and Trust Fund Status

Our case is extraordinary in one respect:  The defendants are railroads and the funds at

issue are interline freight charges.  Beginning with the Third Circuit's opinion in  In re Penn

Central Transp. Co., 486 F.2d 519 (3rd Cir. 1973) (en banc) (hereafter "Penn Central"), a

substantial body of case law has accorded special treatment to such parties and funds,

recognizing a trustee/beneficiary relationship as a matter of *federal common law* in

circumstances where the usual rule of decision would deny it.[14]

Penn Central, a case decided under the Bankruptcy Act and before the current ISS and

Clearinghouse structure was erected, articulates a general proposition supporting the defendants'

claim that their dealings with BAR are trustee/beneficiary, not debtor/creditor, relationships.

There, the Penn Central Railroad's trustees sought to collect passenger and freight charges other

---

[13]    The court's citation to In re Penn Central Transp. Co., 328 F. Supp. 1278 (E.D. Pa.
1971), is worth noting.  The cited case refers to a dispute between the debtor and Greyhound Bus
Lines.  It is a related, but distinct,  matter than  In re Penn Central Transp. Co.,  486 F.2d 519 (3d
Cir. 1973), the case cited in General Mandatory Rule 149 and discussed infra.

[14]  In the usual case, claims to equitable ownership of estate assets are decided by applying
state law principles, consistent with the Supreme Court's edict in Butner v. United States, 440 U.S.
48 (1979), that the property rights parties bring with them into bankruptcy are so defined.

carriers had collected, but which were due Penn Central for its participation in interline services.

At the same time, the interline carriers sought charges collected by Penn Central, but owed to

them for such services.[15]  When the other carriers sought to offset what Penn Central owed them

against the Penn Central's trustees' demands, the trustees petitioned the court to order that the

interline carriers pay "all balances due."  Penn Central, 486 F.2d at 522.  The responding carriers

counterclaimed, asserting set-off rights and, further, argued, inter alia, that Penn Central held

funds collected on their behalf for interline freight and passenger services "in trust" for their

benefit.  Id. at 523.

Without purporting to apply federal common law, the Third Circuit majority opinion

adopted a "common sense interpretation" of the arrangement and applied "traditional common

law trust principles" to conclude that "transportation and freight charges, *when collected*, are

held in trust" for the interline carriers to whom the charges are owed.  Id. at 524.

In reaching its conclusion the Penn Central majority considered three principal points.

First, it inferred the existence of a consensual trustee/beneficiary relationship:  "The parties'

manifestation of intention ultimately controls whether or not a trust relationship exists ...."  Id.

When "the language of the parties fails to clearly indicate their intention, it may be ascertained

by other objective manifestations of intent, such as the facts and circumstances surrounding the

transaction and the relationship of the parties."  Id.  Second, it considered that in the period

between collection and settlement, no interest accrued on the funds in the collecting railroad's

hands.  A "debtor-creditor relationship entails the right to use another's money, the usual quid

---

[15]      In Penn Central, the interline settlements were governed by AAR rules then extant.
 Penn Central, 486 F.2d at 523-24.   To the extent they differed from the ISS described above, the
differences are not critical to today's analysis.

pro quo for which is the obligation to pay interest" and "[c]onversely, the collection by Penn

Central as an agent of money due and owing the other railroads suggests a trust." Id.  Third,

although Penn Central commingled the freight charges with other revenues, "[c]ommingling of

monies has minimal significance in the extraordinary operation of interline railroads." Id. at

525.[16]  However, summarizing its holding, the court emphasized that the principles it applied

were not railroad-specific.  Rather, they were "appropriate to any industry, regardless of [its]

operational problems," although their application to a case involving interline rail carriers

"supports the congressional policy encouraging interline rail transportation of freight and

passengers nationwide.  Id. at 527.[17]

In a concurring opinion, Judge Adams considered the majority's reliance on trust law

principles too timid.  Stressing the federal interest in maintaining a unified national rail system,

he urged express adoption of a federal standard and worried that the majority's approach could

fall short of effecting important federal goals in future cases.  Id. at 533.[18]          .

---

[16]     The court considered that, in the context of interline railroad operations, entailing "innumerable daily collections," segregating freight charges collected for other lines would be impractical.  Id. at 525.

[17]     Without commenting on the significance of the point, the Penn Central court observed that the settlement rules enabled interline carriers to draw their entitlements from collecting carriers in instances when the "charges have not yet been collected from the shippers." Id. at 525.

[18]

Rather than merely invoke the hoary principles of trust law to settle this case, I would treat the problem of interline freight and passenger accounts as a *sui generis* matter. Having perceived Congress' interest in creating and maintaining a viable interline rail system, it would be appropriate to hold that, even in the *absence* of anything formally resembling a "trust," the interlines are entitled to a preferred position with respect to freight and passenger revenues owed them by a railroad in reorganization.

This is not to suggest that venerated legal doctrines can never provide guidance to

Courts have read <u>Penn Central</u> broadly, melding Judge Adams's concurrence with the majority opinion.  Although they have not departed from <u>Penn Central</u>'s trust law paradigm, they view the case as embracing a federal common law rule regarding interline carriers' superior rights to interline freight charge funds in the collecting carrier's hands.  <u>Chase v. Committee of Interline Railroads (In re Ann Arbor Railroad Co.)</u>, 623 F.2d 480, 482 (6th Cir. 1980).  Some have taken it to establish a federal common law rule of implied trusts.  <u>See, e.g., Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Systems. Inc. (In re Columbia Gas Systems, Inc.)</u>, 997 F.2d 1039, 1056 (3d Cir. 1993) (adopting a federal common law rule regarding trust status of natural gas supplier refunds to be passed from suppliers, through debtor, to customers: "Federal common law, however, provides a more expansive definition of an implied trust.  Federal common law imposes a trust when an entity acts as a conduit, collecting money from one source and  forwarding it to its intended recipient."); <u>In re Lehigh & New England Railway Co.</u>, 657 F.2d 570 (3d Cir. 1981)(recognizing interline carriers' rights in interline freight charge revenues but denying them priority over mortgaged assets derived from other sources); <u>In re Ann Arbor Railroad Co.</u>, 623 F.2d at 482 (6th

---

a court confronted with novel questions of transportation law.  But where Congress has, by statute and articulation of a national policy, prompted the judiciary to consider the effects of its decisions upon the nation's entire transportation system, there does not seem to be justification for exclusive reliance upon the narrow principles of private law.   The demands in treating a matter of national transportation policy are best met by a candid and informed weighing of competing interests, within the compass of the judicial process, rather than by use of dogmas or labels that may prove too inflexible to solve the non-Euclidean problems that are presented.

<u>Id</u>. (Adams, J., concurring).

Cir. 1980).

Allegiance to Penn Central's trust fund analysis has not been universal.  In Union Pacific Railroad Company v. Moritz (In re Iowa Railroad Company), 840 F.2d 535 (7th Cir. 1988), a Seventh Circuit panel, with Judge Easterbrook writing, subjected the Penn Central rationale to a withering critique.  Holding that participating railroads' claims for unpaid interline freight charges were general unsecured claims, the court rejected the notion that interline carriers deserved favored treatment in bankruptcy as a matter of "equity."[19]  The panel noted failed attempts to codify Penn Central in the 1978 Code, commenting:

> The most one can say is that a stalemate in 1978 compelled Congress to avoid the subject of this case.  Whatever the law was then, it still is.  If interline freight balances are "trust funds" under governing law, then giving creditor railroads the status of trust beneficiaries does not violate any principle of equal treatment; the absolute priority rule requires trust beneficiaries to be paid first.  If interline creditors do not have interests in trust funds, then giving them a preference would violate the rule that creditors of the same class be treated equally.  So the question remains: what type of property interest do interline creditors have?

In re Iowa Railroad Co., 840 F.2d at 539.  Reviewing the potential sources of rights for interline carriers, the court found no statutorily created right and no concrete federal interest sufficiently threatened by application of state law concepts as to warrant creation of a federal common law

---

[19]    We may dispose summarily of the argument from "common sense and elemental justice."  The railroads that moved the freight are entitled to be paid – but so are the people who supplied it with diesel fuel, and its other creditors.  All of these persons contributed essential ingredients of the movement of the freight and earned their right to payment.  That the interline creditors have been short changed by the Iowa does not imply that the other creditors should get nothing.

In re Iowa Railroad Co., 840 F.2d at 536.

rule.  Id. at 539-40.[20]  The court outlined strategies interline railroads could easily employ to

avoid the risks that might attend a lack of trust status protection, and noted that other industries,

including airlines, trucking, and telecommunications, provide "interline" services without the

protections urged by the interline railroads.  Id. at 541-42.  In so doing, it made express reference

---

[20]      Assuming that shippers' ability "conveniently to send freight over a network of
connected railroads" is an important federal objective, Judge Easterbrook refuted the proposition
that it, or the related preference that a single carrier be paid in connection with such a shipment,
warranted creation of a federal common law rule:

> To say that there is a federal common law governing interests in funds
> received by rail carriers is to say that state law is preempted.  Until Butner
> many courts believed that bankruptcy permitted federal courts to override
> state rules when that would be desirable in light of some other objective.
> Butner disapproved of that approach, holding that property rights under state
> law govern unless there is a contrary federal rule.
>
> A federal rule must be grounded in a concrete federal interest with which
> he application of state law would interfere.  That the dispute involves the
> interstate transportation network is not enough.... Even when the United
> States is a party, and multi-state transactions are involved, courts must
> ordinarily find in state law the rules of decision.
>
> Private parties stand on both sides of this transaction.  Congress has not
> occupied the field in question.  So only a demonstration of substantial
> conflict between state law and the achievement of an objective defined by
> federal law would support a conclusion that federal law controls.  Extensive
> regulation is no substitute for a conflict.... And it is hard to identify a conflict
> between state and federal policies even if failure to treat interline balances as
> trust funds should lead railroads to bill customers separately.  This is at most
> a question of convenience.  Small conveniences add up, no doubt, and
> shippers prefer the current system, but the inconvenience of separate
> invoicing would not strike at the life blood of interstate commerce.

Id. at 540 (citations omitted).

to the First Circuit's decision in <u>Morales</u>.[21]

    <u>Iowa Railroad</u> did not dissuade <u>Penn Central</u>'s adherents.  <u>See, e.g.</u>, <u>Missouri Pacific Rail</u>

<u>Co. v.  Escanaba & Lake Superior Railroad Co.</u>, 897 F.2d 210 (6th Cir. 1990); <u>Dicello v. Boston</u>

<u>& Maine Corp. (In re Delaware & Hudson Railway Corp.)</u>, 127 B.R. 756 (Bankr. D. Del. 1991);

<u>cf</u>. <u>In re Lehigh & New England Railway Co.</u>, <u>supra</u>, (recognizing continued vitality of <u>Penn</u>

<u>Central</u>, but refusing to extend it to provide interline creditors priority in mortgaged assets not

derived from interline revenues).  <u>Penn Central</u>'s progeny includes non-railroad, bankruptcy

cases that embrace a federal common law standard recognizing trust relationships where the

courts perceive (1) the need for a uniform nationwide standard, (2) state law principles would

risk frustrating an important federal objective, and (3) employing a federal common law rule

---

     [21]    Take the airline business.  Although no statute requires this, most
carriers have interline agreements with others whose routes make
interchanges feasible – either individual contracts or through the
Airline Clearing House, Inc., an association formed for this purpose.
Airlines do this even though bankruptcy has become common
(Continental, Braniff, and Frontier are prominent examples).  They
do so even though the sums one airline has collected for
transportation rendered by another are treated as unsecured debts.
<u>See</u> <u>In re Braniff Airways, Inc.</u>, No. 482-00369 (Bankr. N.D. Tex.
Feb. 1, 1983).  The problems in collecting from a bankrupt airline
pale beside the problems in collecting from bankrupt travel agents.
Agents receive billions of dollars from travelers for services
furnished by airlines; they stand to all airlines much as the Iowa
[Railroad] stands to the Union Pacific.  <u>In re Morales Travel Agency</u>,
667 F.2d 1069 (1st Cir. 1981), holds that the claims of the airlines are
unsecured debts of travel agencies.  Yet airlines go on dealing with
travel agents, and travelers reap the benefits of convenience.  <u>See</u> also
<u>In re Shulman Transport Enterprises</u>, 33 B.R. 383 (S.D.N.Y. 1983),
<u>affirmed</u>, 744 F.2d 293 (2d Cir. 1984), holding that the relation
between air freight forwarding services and the airlines supplying the
transportation is that of debtor-creditor.

<u>Id</u>. at 541.

would not upset reasonable commercial expectations. These cases employ the federal common

law rule to set the estate's reach under § 541(a) in light of § 541(d)'s exclusion for assets to

which a debtor holds only bare legal title.  See In re Columbia Gas Systems, Inc., 997 F.2d at

1055, 1059 ("Congress intended that when a debtor is a mere conduit for funds to travel from

one party to another, it lacks an equitable interest in the monies") (citing United States v.

Kimbell Foods, Inc., 440 U.S. 715 (1979)); United States v. McConnell (In re Flying Boat, Inc.),

258 B.R. 869 (N.D. Tex. 2001) (debtor holds U.S.D.A. user fees and INS inspection fees

collected with airline ticket sales in trust for the United States, funds not part of bankruptcy

estate).

### c.  Putting a Finer Point on it

Neither party before me asserts that the perceived federal interest (viz. an integrated

interstate rail network) buttressing Penn Central and its progeny has waxed or waned appreciably

of late.  Nor do they argue that the Interstate Commerce Commission Termination Act of 1995,

Pub. Law 104-88 (1995), creation of the Surface Transportation Board, id., or ongoing federal

regulatory evolution evince a material change in the substance or extent of federal interest in the

railroads.  Finally, neither side urges that anything in the Bankruptcy Code (e.g., § 541) has

altered controlling concepts about estate property, rendering cases decided under the Bankruptcy

Act obsolete.  I am left to determine whether Iowa Railroad's principles or Penn Central's

precepts should decide the case before me.  If Penn Central and its progeny point the way, the

summary judgment motion might be resolved straightforwardly.[22]

---

[22]      More accurately, the question of trust fund character would be determined.  Even
were I to conclude that the interline freight charge balances paid to the defendants were trust funds,
I could not enter summary judgment in the defendants' favor on the record before me.  Although

Examining the Penn Central rule involves, at bottom, interpretation of § 541.  One might

argue that the contest here is between the federal common law rule and state trust law.  But,

more accurately,  the contest is between a federal rule reflective of state law principles, and a

federal rule fashioned of whole cloth.  See In re Iowa Railroad Co., 840 F.2d 535.  The Penn

Central court did not itself undertake the rigorous analysis that should accompany a court's

decision to fashion a uniform federal common law rule, particularly in an instance where federal

statutes already address the subjects at play (railroads and bankruptcy).  Rather, it employed a

loose, result-driven application of "general principles."[23]  Cf. In re Coumbia Gas Systems, Inc.,

997 F.2d at 1055-56 (engaging Supreme Court's Kimbell Foods analysis as to whether federal

courts should fashion a federal common law rule).[24]

The interline freight charge circumstance presents private parties on both sides of the

equation and, although the federal common law approach that has grown from Penn Central's

holding promotes convenience, it does not protect or effect a specific federal interest.  In re Iowa

Railroad Co., 840 F.2d at 540.  At the same time, Penn Central's rule, to the extent it recognizes

---

following Penn Central would trigger application of the "expansive" federal common law trust
concepts articulated in Columbia Gas, I would still have to apply trust principles in considering the
defendants' resulting entitlements.  As trust beneficiaries, they would yet be required to establish,
by way of a "lowest intermediate balance" analysis, that the funds paid to them were indeed trust
funds - a point on which this record contains no evidence.  To the extent their showing fell short,
they would be unsecured creditors and any funds paid them would be subject to recovery under
§ 553(b).

[23]     Recall that the Penn Central majority did not purport to create a federal common law
rule, but, rather, applied what it considered to be "general principles" of trust law.

[24]     Indeed,  Columbia Gas and McConnell v. U.S., where collection and distribution of
federally mandated rebates and surcharges were at issue, represent much stronger cases for
fashioning a federal common law trust fund doctrine.  The federal interest was definite and specific.
Those cases fall very close to Begier v. IRS, supra, where the Supreme Court concluded that
Congress had statutorily imposed a trust in respect to certain tax obligations.

21

trust funds where the Code and established principles would not, contradicts the Bankruptcy

Code's distribution scheme.

The Penn Central rule is not essential to interstate rail service's survival.  Rail carriers

engaged in interline services for generations before Penn Central was decided.  Similar

industries,  e.g., trucking, airlines, and combinations of trucking and rail, do not enjoy the

protections (read "special treatment") that the trust fund doctrine dispenses.   The railroads'

entire revenue stream is not at risk - only the balances owed them by other interline carriers.  The

doctrine operates effectively only in instances of railroad insolvency and when the insolvent

railroad owes more to another railroad, or other railroads, than they owe it.  And there are a host

of measures the cautious carrier can employ to minimize its risks. See In re Iowa Railroad Co.,

840 F.2d at 541.

 Iowa Railroad analogized the collecting carrier's handling of interline freight charges (a

mix of its own charges and those of others) to a travel agent's collection of air fares and agency

fees -  addressed by the First Circuit in Morales.  In Morales, the travel agency and the airlines

had expressly agreed that funds collected for the airlines' ticket sales "would be held in trust."

Notwithstanding that express agreement, the circuit court refused to accord ticket sales proceeds

trust fund status to remove them from the agency's bankruptcy estate.

 Penn Central considered the lack of interest charges highly significant, but I do not

agree.  Although the absence of interest may generally be indicative of a trust (or at least a non-

debtor/creditor arrangement), in the particular circumstances of interline settlements, it is less so.

Each railroad is handling interline fees owed to other railroads.  Each is free to use those funds

as it chooses, but is obligated to settle up each month.  Since each has unrestricted use of "each

22

other's" funds, assuming interest rates would be uniform, the interest charges would net out to

the same extent as freight charges did.  Thus, interest would only be payable on the net after

setting off balances due from one carrier to the other.

Settlement is accomplished at regular intervals (rather than at collection or soon after).[25]

And, significantly, under General Mandatory Rule 149 the collecting carrier *guaranties*

participating carriers that their freight charges will be paid, whether or not the shipper pays its

bill.  This point was mentioned, but given no weight, in Penn Central.  But it speaks volumes.

The participating carriers are concerned with payment - and the collecting carrier's responsibility

is for collection, not merely safekeeping of funds in hand.

Penn Central also discounted the significance of commingling, given the "extraordinary

operation" of interline railroads, commenting on its "impracticality."  Penn Central, 486 F.2d at

525.  To the contrary, the collecting carrier's freedom to commingle interline freight collections

with its general funds is highly significant - and fundamentally at odds with the

trustee/beneficiary relationship defendants urge.  This feature alone takes the interline settlement

system outside even the "more expansive" trust definition articulated in Columbia Gas, which

considers funds held by a debtor to be without the bankruptcy estate if the debtor holds them as a

"mere conduit."  In re Columbia Gas Systems, Inc., 997 F.2d at 1056; e.g., City of Springfield v.

Ostrander (In re LAN Tamers, Inc.), 329 F.3d 204 (1st Cir. 2004) (reimbursements available

---

[25]     This dispute arises from the fact that for (at least three) months, BAR remained
delinquent in its obligation to settle up with the defendants.  That arrearages could and did accrue
is strongly indicative that, in practice, the parties were mutual creditors and debtors, not mutual
trustees and beneficiaries.  Cf. Southern Railway Co. v. United States, 306 F.2d 119 (5th Cir. 1962)
(railroad that submitted bill and waited for more than a year to be paid without demanding
segregation not accorded priority status).

under federal law and due City of Springfield for installation and maintenance of high-speed data

network in school provided by debtor not property of debtor's estate; debtor was to act as merely

a conduit of the funds since City had already paid in full for services).  One is not a "mere

conduit" when it exercises unrestricted dominion and control over funds - no matter that it may

later have to reckon with its creditors.  That <u>Penn Central</u> purported to apply "general

principles," applicable to "any industry," 486 F.2d at 527, but then bent those principles in light

of the peculiarity of the interline rail system belies the infirmity of its logic.[26]

    The real question before me is not whether the railroads created a trust <u>inter se</u>, but

whether they created an *effective* trust in relation to the rest of the world.  Two parties can create

a security interest as a matter of contract, UCC § 9-1202 (attachment and enforcement of

security interest), but others (some of whom may be creditors who consider the putative

collateral a source of payment) will not be bound if the security interest  is not *perfected*.  UCC

§ 9-1317 (interests taking priority over or free of security interests).[27]

    So it is here.  BAR and its interline creditors labeled their relationship a "trust,"[28] but

failed to effect a trust *relationship*.  <u>Morales</u> held that labeling a relationship is a different matter

than creating one.  <u>In re Morales Travel Agency</u>, 667 F.2d at 1072; <u>see</u> also  <u>In re Iowa Railroad</u>

---

[26]    We expect commercial actors to protect their interests by selecting means that work
within the context of their commerce.  We do not expect courts to alter accepted principles on
occasions where a party has selected a means that is ineffective in that context.

[27]    Third parties, including a bankruptcy trustee, can override an unperfected lien - or
collect back sums paid against the ostensibly secured debt as preferences.  <u>See</u> 11 U.S.C. § 544,
§ 547(b).

[28]    Unlike <u>Penn Central</u> and <u>Iowa Railroad</u>, here it is unnecessary to infer the parties'
intention to create a trust relationship.  The "collecting carrier acts as trustee...." General Mandatory
Rule 149(C), <u>supra</u>.

24

Co., 840 F.2d at 545.  To remove a putative res from a bankruptcy estate, more than a label, or

an unexecuted intention, is required.  General Mandatory Rule 149 may have "recited in general

terms, the [BAR] was to hold whatever monies it collected in trust," but the relationship

remained "in practical fact, that of debtor-creditor."  In re Morales Travel Agency, 667 F.2d at

1071.  "The use of the word 'trust' ... in a contract which is not publicly filed[,]" id, did not

prevent BAR's other creditors from viewing those funds as BAR's own and, ultimately, looking

to them for payment.  "In the absence of any provision requiring [BAR] to hold the funds in trust

by keeping them separate, and otherwise restricting their use, the label 'trust' could in these

circumstances and for present purposes have no legal effect."  Id.  "[T]alsimanic language [can]

not throw a protective mantle over these [funds] in the absence of a genuine trust mechanism."

Id.  This case differs from Morales only in the sense that it is about railroads, rather than airlines

and ticket agents.  That distinction does not compel a different result.[29]

## 2.  Recoupment

Defendants argue in the alternative that, even if collected interline freight charges in

BAR's hands were not trust funds, the amounts they realized through interline settlements were

had by way of recoupment and, therefore, not subject to § 553(b)'s set-off avoidance provision.

The First Circuit has recently explained how set-off and recoupment differ:

---

[29]     The same general principles underly the myriad decisions concluding that labeling
a commercial relationship a "trust" is insufficient to impose fiduciary duties on a debtor for purposes
of dischargeability disputes under § 523(a)(4).  See 3 Norton § 47:20 ("The classification of one who
holds or collects money for another as either a fiduciary or a mere debtor depends, in the absence
of a relevant statute, on the intent of the parties.  A person who is intended to have unrestricted use
of another's money or property, although under an obligation to maker designated payments, is a
debtor-agent and not a fiduciary.  In contrast, if the parties intend that the funds be held in a
segregated account for the creditor's benefit, the holder is a fiduciary.").

The pertinent distinction between a setoff and a recoupment is whether the debt owed the creditor ... arose out of the "same transaction" as the debt the creditor owes the debtor.  For example, if A were to buy a truck worth $1000 from B, but A finds that he must expend $100 to put the truck back into working condition, A might send B a check for only $900, rather than pay B $1000 and await a $100 refund from B.  The $100 A recovers by deducting it from the amount he owes B constitutes a  recoupment because the reciprocal obligations arose out of the same transaction, viz., the purchase-sale of the truck.  Had B filed for bankruptcy protection, A could recoup the $100 prepetition debt from B without violating the automatic stay because "it would b *inequitable* for [B] to enjoy the benefits of that transaction without also meeting its obligations."

\*     \*     \*

However, were A to buy the same truck from B, but instead of sending a $1000 check to B, sends a $900 check (deducting the $100 B still owes him for a bicycle A sold B earlier), the $100 which A has deducted constitutes a setoff because the mutual obligations did not arise out of the same transaction, but from different transactions, *viz.*, the sale of the bicycle and the sale of the truck.

Holyoke Nursing Home, Inc., v. Health Care Fin. Admin. (In re Holyoke Nursing Home, Inc.), 372 F.3d 1, 3 (1st Cir. 2004) (holding that post-petition recoupment did not violate automatic stay); See generally, 3 Norton § 63:2; 5 Collier ¶ 553.10.  Plainly, the interline carriers' monthly settlements are setoffs, not recoupments.  Their settlement system nets claims they hold against each other arising from a multitude of separate transactions, each distinct and initiated by a third-party shipper.  That the railroads have overlaid an elaborate, efficient, integrated system to reconcile their accounts and pay one another does not consolidate those separate transactions into a single one.

Moreover, "[r]ecoupment is a purely defensive mechanism, entitling the defendant to a reduction of the plaintiff's claim."  3 Norton § 63:2.  The trustee here is seeking to recapture the defendants' affirmative recoveries.  Recoupment does not apply.

**3.  Policy Considerations**

The defendants also assert that § 553(b) was not designed with transactions of this ilk in

mind.  By its terms, § 553(b)'s reach extends to all instances when a setoff, or series of setoffs, results in a creditor bettering its position in the ninety days before bankruptcy.[30]  It is not limited to activities of banks or other depositories.  It applies to "creditors."  See 11 U.S.C. § 101(10) (defining "creditor" expansively).  Of course, the section was designed to "discourage creditors from taking setoffs against debts owed to insolvent debtors under circumstances where a creditor might be sorely tempted to take a set off because of an improved setoff opportunity." 5 Collier ¶ 553.09[2].  And,  "[a]lthough not restricted by its terms to bank setoffs, Code § 553(b) was designed with the banking context uppermost in mind, and as a consequence it has not found widespread application elsewhere." 3 Norton §63:19.  But § 553(b)'s limited historical application is entirely explicable: the statute operates *most often* in its intended sphere.[31]  That experience, however, does restrict its application to other creditors.  See, e.g., Turner v. Small Bus. Admin. (In re Turner), 96 F.3d 465 (10th Cir. 1996) (applying § 553(b) to offsets taken by federal agency, but finding no avoidable improvement of position); Woodrum v. Ford Motor

---

[30]    Like the Code's preference avoidance section, 11 U.S.C. § 547(b), it operates whether or not the creditor acted in any way culpably.

[31]    Collier's example demonstrates how § 553(b) operates in the "usual" case:

[S]uppose a bank holds a claim against the debtor in the amount of $100,000. Suppose 90 days before bankruptcy, the debtor had on deposit with the bank the sum of $50,000.  Suppose 30 days before bankruptcy, the debtor deposits an additional $50,000, bringing the total amount of the debtor's deposit with the bank to $100,000. If the debtor is experiencing financial difficulty and has defaulted on its obligations to the bank, the bank might be tempted to take a setoff at the moment the debtor's deposit balance is at its highest.  However, such an offset might well plunge the debtor into financial ruin.  The purpose of section 553(b) is to remove the bank's temptation to take the setoff by providing for the recovery in bankruptcy of an amount equal to the value of the improvement in the bank's position.

5 Collier ¶ 553.09[2].  One can see that the usual case can arise commonly.

Credit Co. (In re Dillard Ford, Inc.), 940 F.2d 1507 (11th Cir. 1991); Braniff Airways, Inc. v.

Exxon Co., U.S.A. (In re Braniff Airways Co.), 814 F.2d 1030 (5th Cir. 1987).

Having determined that the defendants are creditors, rather than trust beneficiaries,

§ 553(b)'s application is self-evident.[32]

Conclusion

For the reasons set forth above, the defendants' motion for summary judgment is

DENIED.  It necessarily follows that the plaintiff's motion, seeking a determination that

§ 553(b) applies, is GRANTED.


DATED  February 15, 2005

/s/ James B. Haines, Jr.

James B. Haines, Jr.
U.S. Bankruptcy Judge

---

[32]     Section 1161 provides that certain sections of the Code do not apply in railroad reorganization cases.  Section 553(b) is not among the excluded provisions.